**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MELISSA LEEANN THOMAS,**

     **Plaintiff,**

**vs.**                          **CIVIL ACTION NO. 2:17-CV-03747**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered August 4, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 15 and 16.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 15.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 16.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

1

**Procedural History**

The Plaintiff, Melissa Leeann Thomas (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on November 19, 2013, alleging disability since November 5, 2013, because of "severe depression, arthritis, fibromyalgia, vascular blood flow lower extremities both legs swelling, kidney issues, heart palpitations, extreme fatigue, and hypothyroidism". (Tr. at 212-215, 216-224, 240.) Her claims were initially denied on April 2, 2014 (Tr. at 128-140.) and again upon reconsideration on June 6, 2014. (Tr. at 143-149, 150-156.) Thereafter, Claimant filed a written request for hearing on July 25, 2014. (Tr. at 157-158.)

An administrative hearing was held on February 5, 2016 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 38-65.) On March 21, 2016, the ALJ entered an unfavorable decision. (Tr. at 8-29.) On April 20, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 208-211.) The ALJ's decision became the final decision of the Commissioner on June 6, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-7.)

On August 2, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Memorandum in Support of Motion for Judgment on the Pleadings (Document No. 15.); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 16.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 38 years old as of the alleged onset date, and considered a "younger person"

throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 21.)

Claimant has a college education. (Tr. at 241.) Claimant quit working on November 5, 2013[1] as

an education systems coordinator at a hospital because of extreme fatigue, swelling in her legs,

and a "ripping and burning" sensation in her back and neck. (Tr. at 43, 60, 241.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has

the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).

A disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable impairment which can be expected to last for a continuous period of

not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of

disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any

step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the

sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§

404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1

to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does,

the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether

the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f),

416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.

---

[1] Claimant indicated in her application forms that she had been fired because "I got angry when told to come off FMLA from my job at Raleigh General Hospital", so she walked out. (Tr. at 259.)

Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[2]

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 13, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of November 5, 2013. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine; fibromyalgia; seronegative rheumatoid arthritis; venous insufficiency status-post venous closure; obesity; major depressive disorder; intermittent explosive disorder; and anxiety state, not otherwise specified. (Tr. at 14, Finding No. 3.)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the

6

level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work:

> She can lift and carry 10 pounds occasionally and less than 10 pounds frequently. She can stand and walk two hours in an eight-hour workday and sit six hours in an eight-hour workday. The claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. She can tolerate occasional exposure to extreme temperatures, vibrations, and hazards. She retains the capacity to understand, remember, and carry out simple, routine, repetitive tasks and she can respond appropriately to occasional superficial interaction with coworkers and supervisors, in [an] environment free from teamwork and no over-the-shoulder supervision. The claimant can tolerate no interactions with the general public. She can make simple work-related decisions.

(Tr. at 18, Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 21-22, Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from November 5, 2013 through the date of the decision. (Tr. at 23, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two main errors in support of this appeal: first, she argues that the ALJ failed to perform a complete function-by-function analysis in forming the RFC assessment; second, the ALJ did not follow the Regulations or controlling jurisprudence in analyzing Claimant's subjective symptoms. (Document No. 15 at 7.) Specifically with regard to the first

alleged ground of error, Claimant contends that the ALJ formulated her RFC without having considered Claimant's functional limitations from the swelling of her lower extremities. (Id. at 8-9.) The medical evidence confirmed that Claimant continued to experience bilateral lower extremity edema that interfered with her ability to sit, walk and stand and also required her to elevate her legs, however, the ALJ failed to include the appropriate hypothetical question to the vocational expert that considered this, therefore, the ALJ's step five analysis is not supported by substantial evidence. (Id. at 9-10.)

With respect to the second alleged ground, Claimant asserts that the ALJ did not perform the two-step analysis concerning Claimant's subjective symptoms and further ignored the factors the Regulations require adjudicators to consider when assessing a claimant's credibility. (Id. at 11-12.) Moreover, Claimant contends that the ALJ assessed her RFC prior to evaluating her credibility, in contravention to Mascio v. Colvin, 780 F.3d 632, 639-640 (4th Cir. 2015). (Id. at 12.) Claimant argues that the ALJ did not expressly consider her testimony when making her RFC assessment. (Id. at 12-13.)

Claimant asks that the Court enter an order reversing the final decision and remand this matter back to correct these errors. (Id. at 13.)

In response, the Commissioner argues that the ALJ properly accounted for all of Claimant's credibly established limitations in her RFC assessment, especially with respect to her bilateral lower extremity swelling. (Document No. 16 at 7-9.) The Commissioner further argues that Claimant does not identify any objective medical evidence in the record that indicated any particular functional limitations as result of her leg swelling, but relies instead on her own subjective complaints. (Id. at 9.) Additionally, the Commissioner states that the ALJ considered

the entirety of the medical evidence concerning Claimant's leg swelling, and the ALJ acknowledged that her treating physician noted that prescribed medication and compression stockings improved Claimant's symptoms and that her physical examinations were normal. (Id.) The Commissioner points out that a patient's subjective complaints that are recorded by a physician are not considered objective medical findings. (Id. at 9-10.)

With respect to Claimant's contention that the ALJ did not perform a function-by-function analysis, the Commissioner argues that courts in the Fourth Circuit have rejected form over substance arguments, and a reviewing court is required to view the ALJ's decision as a whole. (Id. at 10.) Moreover, the Fourth Circuit in Mascio v. Colvin rejected a *per se* rule that an ALJ is to perform an explicit function-by-function analysis. (Id. at 11.) The only question before this Court is whether the ALJ herein thoroughly reviewed the evidence of record and explained how it supported her RFC and ultimately, whether her decision is supported by substantial evidence. (Id. at 12.)

Finally, the Commissioner states that Claimant's challenge to the ALJ's hypothetical to the vocational expert is simply a reframing of her challenge to the RFC; the ALJ herein included all of Claimant's credibly-established limitations in her RFC finding and in the corresponding hypothetical to the vocational expert, therefore, Claimant's argument to this extent lacks merit. (Id.)

Next, the Commissioner argues that the ALJ expressly performed the two-step analysis of Claimant's subjective complaints and that her analysis further complied with the Regulations. (Id. at 13-14.) The ALJ provided several instances from the record as to why she found Claimant not entirely credible. (Id. at 14-15.) Furthermore, the Commissioner argues that the ALJ did not assess

her RFC prior to evaluating Claimant's credibility and that Claimant overlooked the ALJ's review of her subjective complaints in her decision. (Id. at 15.) The Commissioner contends the ALJ expressly stated that she did consider the particular Regulation regarding the seven factors in evaluating her symptoms with the objective medical evidence, and absent any evidence to the contrary, should be taken at her word. (Id.) Furthermore, the ALJ was not required to follow any particular format or to discuss each of the seven factors in her analysis, and despite Claimant's contention otherwise, the ALJ gave significant credence to Claimant's testimony and subjective complaints which is evident in the RFC finding. (Id. at 16.)

The Commissioner asserts that substantial evidence supports the ALJ's RFC assessment as well as her credibility determination; ultimately, the decision finding Claimant was not disabled is also supported by substantial evidence. (Id. at 17.) The Commissioner asks this Court to affirm her final decision. (Id.)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Records Related to Venus Insufficiency:

In January 2013, Claimant was referred to Herbert P. Oye, D.O. of the West Virginia Vascular Institute by her primary care provider due to claudication pain in her bilateral lower extremities. (Tr. at 510-513.) It was noted that she experienced edema, pain, as well as varicose veins in her lower extremities with other complications. (Tr. at 512.) Dr. Oye scheduled Claimant

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings; in this appeal, the argument centers on the ALJ's treatment of Claimant's bilateral leg swelling.

for a venogram for further evaluation. (Id.)

Later in January 2013, Dr. Oye performed a bilateral lower extremity venous closure of long saphenous veins in Claimant due to her ongoing complaint of pain and edema. (Tr. at 359-360.) Claimant tolerated the procedure well, however, findings indicated there was no need for surgical intervention, though she would need to wear support stockings. (Tr. at 359.)

Dr. Oye's treatment notes dated July 2013 indicated that Claimant had a "normal bilateral lower extremity venous duplex study based on compressions and augmentations. No evidence of DVT." (Tr. at 520.) In August 2013, Claimant reported that she had difficulty walking due to right groin pain,[4] though Dr. Oye observed she had no erythema or edema in both legs. (Tr. at 523-525.)

Claimant had a follow up appointment in April 2014 for her leg pain. (Tr. at 531-535, 536-540.) She reported that vitamin D helps, but she continued to have aching in her legs and also swelling. (Tr. at 531, 536.) She described the pain as "a tourniquet being around the mid-tibia and ankle" and that she "cannot sit for long because this causes increasing swelling and pain." (Id.) She further stated that her right leg had worse swelling. (Id.) Dr. Oye observed that Claimant had edema in both legs and that where Claimant described the tourniquet sensation, she had a "bank like discoloration" in those areas. (Tr. at 532, 537.) Dr. Oye also observed that Claimant was "ambulatory with normal gait." (Tr. at 533, 538.)

By June 2014, Claimant reported wearing TED hose as instructed and that she was feeling "less sensation of a tourniquet around her legs." (Tr. at 541, 780.) Dr. Oye noted she had edema in her lower legs, but ambulated with a normal gait. (Tr. at 542, 781.) In July 2014, Claimant reported

---

[4] The medical records show that Dr. Oye performed a CT scan of Claimant's aorta, abdomen and lower extremities due to her complaints of right groin pain; the results were normal, and hernia was ruled out. (Tr. at 338-340.) Prior to the alleged onset date, Claimant was also treated for her groin and flank pain by her primary care physician, Dr. Lora Keaveny and urologist Dr. Lynnetta Payne, as Claimant had a long history of urethral dilations. (Tr. at 342-355.)

that though she had some decrease in swelling and the "tourniquet" sensation, she continued to have pain and swelling and reported that the pain had "wakened her one time – not as before phlebectomy." (Tr. at 545, 549, 595.) Again, though Dr. Oye observed edema was present in both of her legs, Claimant ambulated with a normal gait. (Tr. at 546, 550, 596.) In September 2014, Claimant reported worsening swelling in her legs since starting medications by her treating rheumatologist, Dr. Saikali, and that medications Demadex and Bumex did not help. (Tr. at 599.) Dr. Oye prescribed Lasix and recommended Kushy foot stockings or Dr. Scholl's compression stockings; he noted Claimant was ambulatory with normal gait. (Tr. at 601.)

By January 2015, Claimant reported to Dr. Oye that the Lasix "helped a lot" but she still had bilateral swelling and the "tourniquet sensation" in her right leg. (Tr. at 602.) She reported that the sensation moved up the leg and that it can occur while lying down or with activity; she had increased pain a few times, but described it as "not aching, it's different." (Id.) Claimant also stated that if she sits for too long, her pain increases and she has to elevate her legs. (Id.) Dr. Oye noted that Claimant wore her compression stockings and that she was ambulatory with a normal gait. (Tr. at 603.) Dr. Oye continued her prescription for Lasix and instructed her to follow up in one week. (Tr. at 604.)

During the follow up appointment for her venous and ABI studies for leg pain evaluation, Claimant rated her pain as 6 out of 10; Claimant reported some improvement with her swelling with Lasix and that she continued to wear knee-high compression stockings daily. (Tr. at 605.) Dr. Oye observed that Claimant had no edema and ambulated with a normal gait; the right lower extremity venous Doppler ultrasound indicated negative findings for DVT and the ABI ultrasound resulted in normal bilateral lower extremities. (Tr. at 606, 607.) Claimant was noted to be

12

compliant with compression and elevation of her legs, and due to the sonograms resulting in no acute findings, Dr. Oye recommended further evaluation with a venogram of the right leg. (Id.) On January 29, 2015, the venogram results were negative. (Tr. at 688-692.)

Records from Claimant's Primary Care Provider:

Treatment notes from Lora Keaveny, D.O. at the Peterson Clinic in March 2015 indicate that Claimant reported feeling tightness on the right lower leg as well as numbness. (Tr. at 650.) Claimant also reported that joint pain in her right arm caused her trouble with lifting and doing activities of daily living. (Id.) Dr. Keaveny noted Claimant ambulated normally, though she demonstrated tenderness and bony deformity, warm and edema over her right elbow, wrist and MCP joints. (Tr. at 653.)

The record indicates that Claimant was also treated by cardiologist Jashvantial K. Thakkar, M.D., numerous times before and after the alleged onset date. (Tr. at 448-506, 679-686, 715-717.) In May 2015, Dr. Keaveny again referred Claimant to Dr. Thakkar due to her complaints of shortness of breath, chest pain and hypertension. (Tr. at 753-755.) In July 2015, Dr. Thakkar noted Claimant had mild lower extremity edema, no varicosities, no head bobbing, no foot bobbing, and pulse pressure within normal limits. (Tr. at 754.) Dr. Thakkar reviewed the most recent cardiac studies which were all benign and averred that it was unlikely that Claimant's symptoms were cardiac. (Tr. at 717.) Dr. Thakkar instructed Claimant to maintain a low cholesterol, low fat diet, and ideal body weight. (Tr. at 754-755.) Dr. Thakkar also recommended that she engage in cardio aerobic exercise, 30 minutes every day, 5 days a week. (Tr. at 755.)

Claimant's Treating Rheumatologist:

Treatment notes from Wassim S. Saikali, M.D. dated February 26, 2015 indicate that

Claimant's swelling and stiffness improved with medications, though she continued to complain of pain and discomfort in multiple areas including her hands. (Tr. at 645.) By March 26, 2015, Claimant reported to Dr. Saikali "this is the first time she feels a little better" regarding her inflammatory arthritis, mild osteoarthritis and fibromyalgia. (Tr. at 723.) She still complained of mild, dull, and achy pains in her hands and in the foot area, though reported that her swelling and stiffness in the morning improved despite ongoing pain and discomfort. (Id.) Dr. Saikali recommended that Claimant "[t]ry to lose weight and increase activity" and he instructed her to return in three months. (Tr. at 724.)

On July 1, 2015, PA-C Ruth Rhodes performed a physical examination, noting Claimant's spine was normal, and she had full range of motion of both knees and no ankle edema. (Tr. at 725.) On October 1, 2015, Claimant reported to Dr. Saikali that she was not doing well, having severe pain and discomfort in different areas, including her hands, knees and back. (Tr. at 726.) Dr. Saikali was concerned that he would not be able to help Claimant as she reported no help with medication, and to send her to Morgantown for a second opinion, however, Claimant indicated that she was "very happy with the plan and the medication, that did help her some but she is still symptomatic." (Tr. at 727.)

On December 2, 2015, Claimant was seen by PA-C Rhodes again, who observed Claimant had no hot swollen joints in her hands, equal grip strength bilaterally, slight decreased range of motion in the right wrist, full range of both elbows, full range of both shoulders, a normal spine, tenderness with palpation of the nuchal area and trapezius muscles bilaterally, intact hips, full range of motion of both knees, and no ankle edema. (Tr. at 701.) Claimant reported the higher dose of baclofen improved her neck and back pain significantly, and all other medications were

14

continued. (Id.)

<u>Consultative Examination Report:</u>

In February 2014, Claimant was examined by DDS examiner Serafino S. Maducdoc, Jr.,

M.D. (Tr. at 437-441.) Claimant reported to Dr. Maducdoc that she experienced swelling in her

legs for about three years prior to the venous closure. (Tr. at 437.) Dr. Maducdoc noted that she

had normal range of motion of her shoulders, elbows, wrists, and knees; normal hips and ankles;

straight leg testing both sitting and supine were normal and full lower extremity muscle strength

with good effort. (Tr. at 440.) Though Claimant demonstrated a normal gait, she was unable to

walk on her heels or toes, and Dr. Maducdoc gave her a poor prognosis. (Id.)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant had not worked since 2013. (Tr. at 41.) She confirmed diagnoses including

anxiety, degenerative disc disease of the lumbar spine and fibromyalgia. (Tr. at 41-42.) She

described vascular problems in her lower extremities for which she had undergone a venous

closure surgery in 2011. (Tr. at 42.) She stated she had urinary difficulties with stricture, urgency,

and hesitancy. (Id.) Claimant stated she treated with a rheumatologist over the past couple years

for fibromyalgia and inflammation of her hands, elbows, and ankles. (Tr. at 42-43.) She was

prescribed several types of medications that had not worked, though an increase in methotrexate

injections seemed to hold down the inflammation. (Tr. at 43.)

Claimant explained she had stopped working due to extreme fatigue and bilateral leg

swelling. (Id.) She stated her legs would swell to the point that she would need to take her socks

and shoes off and elevate her legs. (Id.) She also described a ripping and burning sensation in her

back and neck. (<u>Id</u>.) Claimant stated she then began to experience depression because she was not able to work. (<u>Id</u>.) She indicated her fatigue was associated with fibromyalgia, hypothyroidism, inflammation, and depression. (Tr. at 44.) She described a burning feeling and stated she became extremely stiff and had an increase in swelling in her legs while sitting. (<u>Id</u>.) Claimant described pain and burning from her neck through her shoulders and down the middle of her back in a spreading pattern. (Tr. at 45.) She stated Cymbalta had not worked, and although baclofen helped some, she still had symptoms with prolonged standing or sitting. (<u>Id</u>.)

Claimant testified that she sat during the day to ease her back pain and leg swelling but had to lie down and elevate her legs when the swelling worsened. (Tr. at 46, 49-50.) She estimated that she would elevate her legs usually every day and several times throughout the day, for at least a few hours. (Tr. at 49.) She used a heating pad on her back and had to change positions throughout the day. (Tr. at 46.) She stated her back felt like it was "going to break in two," and she had not received treatment from a spine doctor because she was waiting for Medicaid approval. (Tr. at 46-47.) Claimant stated she borrowed her father's TENS unit but is in constant pain at a level 5 or 6 on a 10-point scale. (Tr. at 47.) She takes tramadol and Neurontin, which ease the pain in her joints and inflammation, and she believed her medication helped with her back "a little too." (<u>Id</u>.) She confirmed her pain was worsened with activity, and she relied on her daughters for cleaning her apartment and laundry due to her extreme fatigue and pain. (Tr. at 47-48.)

Claimant stated she recently started using a cane because of her back pain, she explained that it was not prescribed, she borrowed one of her father's. (Tr. at 48, 49.) She stated she used the cane at least five times a week. (Tr. at 49.) She also indicated she had been prescribed compression stockings for when she traveled to the store or the doctor's office, and although she still has

swelling, they have helped keep the swelling down along with the Lasix. (Tr. at 50.) She has no side effects from her medications. (Tr. at 50-51.)

Claimant testified she could not "do a lot of lifting" and could not squat due to pressure in her right knee because of mild to moderate arthritis. (Tr. at 51.) She stated she could lift a gallon of milk but could not hold onto it for a long time. (Tr. at 52.) She stated she had begun to experience burning in her neck and muscles with 25 minutes of sitting at the hearing but could sit approximately two or three hours at a time. (Tr. at 52-53.) Claimant stated she could stand or walk 30 minutes to an hour at a time. (Tr. at 53.)

Claimant stated that she could not be around many people due to her depression. (Id.) She described irritability, anger, self-isolation, and a lack of interest. (Tr. at 54, 58-59.) She stated she had difficulties with her short-term memory, attention, and concentration, and experienced memory fog. (Tr. at 54.) Claimant stated she did not finish projects and needed reminders for appointments and medications. (Tr. at 55.) She stated she could complete a limited range of personal care activities. (Tr. at 56-57.)

<u>William Tanzey, Vocational Expert ("VE") Testimony:</u>

The VE described Claimant's past work to include telemarketing instructor (DOT No. 239.227-010) at the skilled, sedentary level and systems educator (DOT No. 079.117-014), systems instructor (DOT No. 090.227-010), and office manager (DOT No. 169.167-034) at the skilled, light level. (Tr. at 61.) The ALJ asked the VE to consider a hypothetical individual with Claimant's vocational profile and controlling RFC. (Tr. at 61-62.) The VE responded the individual perform unskilled work and provided a representative sample of job in the national economy. (Tr. at 62.)

The VE confirmed the representative jobs would not be affected by the individual's need to sit for two to three hours, or stand or walk 30 minutes to an hour at a time. (Tr. at 62-63.) The VE further stated that an individual would be precluded from all work activity if unable to engage in any social interaction or needed occasional reminders with some additional supervision throughout the day. (Tr. at 63.) The VE also testified that an individual who missed two or more days per month or was off task due to the need to elevate their legs or change position would be prevented from competitive work activity. (Tr. at 63-64.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

The RFC Assessment/Hypothetical Question to VE:

Claimant contends that the RFC assessment is flawed because it does not account for her venous insufficiency impairment, specifically with regard to her bilateral leg swelling and need to elevate her legs, and by extension, the hypothetical questions the ALJ posed to the VE failed to accommodate this impairment. (Document No. 15 at 8-10.)

Residual functional capacity represents the *most* that an individual can do despite her limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

There is no dispute that Claimant demonstrated continued swelling of the lower extremities in varying degrees despite continued treatment with medication and consistent use of compression stockings. However, there is no opinion evidence in the record that suggested Claimant's functional capacity was reduced because of her bilateral lower extremity swelling due to venous insufficiency. Indeed, it was noted by the ALJ that Claimant "denied any functional limitation" to

Dr. Saikali on December 2, 2015 after having "significant improvement with an increased dosage of one of her medications." (Tr. at 19, 701.) Furthermore, the ALJ acknowledged that earlier in the year, in July 2015, Claimant was advised by Dr. Thakkar that she follow a low cholesterol diet and exercise five days a week.[5] (Tr. at 15, 717.)

Claimant alleges that she must prop up her legs several times a day for several hours in order to reduce the swelling in her legs. (Tr. at 49-50.) Despite her argument that the "medical evidence throughout the file also confirmed [her bilateral lower extremity edema] interfered with her ability to sit, walk, and stand and that required her to elevate her legs for relief", the medical evidence of record does not substantiate this. Medical records show that she reported to Dr. Oye on just two occasions that "sitting for too long" causes her swelling and pain to increase.[6] (Tr. at 531, 602.) Only on the second occasion did Claimant report to Dr. Oye that she had to elevate her legs to relieve the pain and swelling.[7] (Tr. at 602.) The Commissioner is correct that the

---

[5] The undersigned notes that Dr. Thakkar's recommendation that Claimant increase her physical activity as well as Dr. Saikali's recommendation that she increase her physical activity, discussed *supra* (Tr. at 724.), belies Claimant's allegations of disabling conditions, let alone from her bilateral lower extremity swelling.

[6] A treatment note dated April 15, 2014 indicated that Claimant had swelling in her legs and that sitting "for long" caused her swelling and pain to increase, especially in her right leg, however, Dr. Oye also observed Claimant to be "ambulatory with normal gait." (Tr. at 531, 533.) In the months following, Dr. Oye noted that Claimant's swelling improved from using compression stockings, and she continued to ambulate normally. A treatment note dated January 19, 2015 indicated that though Lasix "helped a lot", Claimant described the painful tourniquet sensation became worse if she "sits for too long" and therefore must elevate her legs. (Tr. at 602.) During the follow up appointment a week later, on January 28, 2015, Claimant reported to Dr. Oye that her swelling improved from Lasix, and that she was "complaint in compression and elevation." (Tr. at 607.)

[7] The undersigned feels compelled to point out a critical inaccuracy contained in Claimant's Counsel's brief. (Document No. 15 at 9.) Specifically, Counsel asserts: "Medical evidence throughout the file also confirmed Thomas continued to experience bilateral lower extremity edema that interfered with her ability to sit, walk, and stand and that required her to elevate her legs for relief. (Tr. 359-60, 437-38, 440, 510-22, 595-608, 650-54, 687-92, 772-34, 753-55, 780-81)." This particular point was the crux of the Claimant's argument for reversal. However, a review of the transcript references noted by Claimant's Counsel reveals that no "medical evidence" indicated that the edema "interfered with her ability to sit, walk, and stand and that required her to elevate her legs for relief." The undersigned was able to find the above two **reports by claimant** that related to issues with sitting for too long. The assertion that "medical evidence thought the file confirmed" the interference with her ability to sit, walk and stand and that required her to elevate her legs for relief" was not borne out upon an extensive review of the medical records contained in the transcript. Importantly, there is no medical record that indicates Claimant was required to elevate her legs in order to obtain relief, or that the edema interfered with her ability to sit, walk and/or stand.

20

Regulations provide that a claimant's statement of symptoms do not constitute medical evidence of an impairment.[8] (Document No. 16 at 9-10.)

To the extent that Dr. Oye once noted Claimant to be "compliant" with her medication, compression stockings and "elevation", the medical evidence of record fails to demonstrate that Claimant had consistent functional limitations in her ability to sit, stand, and walk due to lower extremity swelling that precluded all employment.

This is important with respect to the vocational expert's testimony, *supra*, that a hypothetical individual with Claimant's limitations could perform less than the full range of sedentary work. (Tr. at 22, 62.) Though the jobs he identified would accommodate Claimant's testimony that she was capable of sitting two to three hours, and stand or walk thirty minutes to an hour, the vocational expert confirmed that if the individual were projected to be off task in order to elevate her legs or change position, then no jobs would be available. (Tr. at 62, 63-64.) Hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As discussed above, Claimant's allegation that her leg swelling interfered with her ability to walk, sit and stand and that she was required to elevate her legs, is simply not supported by the medical record of evidence.

Moreover, to the extent her allegation conflicts with the other evidence of record, as stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Accordingly, Claimant's contention that the ALJ committed reversible error where the hypothetical questions posed to the vocational expert and the resultant

---

[8] See 20 C.F.R §§ 404.1508, 416.908.

RFC assessment failed to accommodate Claimant's need to elevate her legs several times a day for a few hours due to swelling is without merit.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

The Credibility Assessment:

As an initial matter, Claimant alleged that the ALJ failed to perform the "two-tiered subjective symptoms analysis", ignored her testimony, and performed the credibility assessment after the RFC assessment. (Document No. 15 at 10-13.) However, the undersigned finds that is not the case here: the ALJ properly applied the two-step process espoused by Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), and then proceeded to review Claimant's subjective complaints, which included her testimony, and reconciled them with the medical evidence of record. (Tr. at 18-21.) Afterwards, the ALJ determined that "the above [RFC] assessment is supported by the physical examinations, the consultative evaluations, the diagnostic studies, and Dr. Bartee's opinion." (Tr. at 21.) It is clear that the ALJ did not assess the RFC prior to the credibility determination that constitutes reversible error under Mascio v. Colvin.[9]

Accordingly, the undersigned **FINDS** Claimant's argument that the ALJ formulated her RFC prior to evaluating Claimant's credibility lacks merit, that she did not perform the two-step subjective symptoms analysis or that she failed to consider Claimant's testimony lacks merit.

Claimant's other argument is that the ALJ did not properly evaluate her credibility in accordance to the Regulations, specifically with respect to her limitations. (Document No. 15 at

---

[9] 780 F.3d at 639-640.

12-13.) The ALJ is bound by Social Security Ruling 96-7p[10], which clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8,

---

[10] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on March 21, 2016. See, SSR 16-3p, 2016 WL 1131509.

2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

As mentioned *supra*, the ALJ's credibility analysis did not offend Fourth Circuit jurisprudence, and the ALJ discussed at length Claimant's statements concerning her pain and other symptoms and compared them with the objective medical records. With regard to her seronegative rheumatoid arthritis and fibromyalgia, the ALJ took note of numerous normal physical examinations performed by her treating rheumatologist having taken place after the alleged onset date; despite Claimant's complaints of pain, she was treated with prescription medications, and that she even reported improvement with treatment. (Tr. at 19.) The ALJ found that though Claimant continued to experience some symptoms "of rheumatoid arthritis and fibromyalgia", her "physical examinations are not consistent with the claimant's level of complaints." (Id.) Additionally, the ALJ noted that though she appeared at the administrative hearing with a cane, "she was consistently observed ambulating with a normal gait and the most recent examination in December indicated significant improvement." (Tr. at 19-20, 440, 533, 542, 596, 601, 603, 624, 658, 701, 840, 844.)

With regard to her venous insufficiency, the ALJ noted that her treating specialist treated Claimant primarily with medication and compression stockings, and acknowledged further, "which helped, although [Dr. Oye] still found swelling of the lower extremities upon examination." (Tr. at 20, 532, 542, 600; "*exceptions found*" at 512, 516, 603, 606.) (*italics* in original) Again, the ALJ took note that Claimant's gait was observed to be normal and that her venograms and ultrasounds were normal. (Tr. at 20.)

24

In short, the ALJ found that Claimant was not as limited by her impairments as alleged. Accordingly, the undersigned **FINDS** that the ALJ's credibility assessment was supported by substantial evidence.

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for Judgment on the Pleadings (Document No. 15.), **GRANT** the Defendant's request to affirm the decision (Document No. 16.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: January 10, 2018.

Omar J. Aboulhosn
United States Magistrate Judge